UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANDREA JORDAN, ELENA CIGLER, LAURA HEIT, SAM SHIREY, TRENT BERGER, GENE KLIPIN, DIANA HUACK, LARRY PETREY, ALAN DALEWITZ, MARSHA DIGIACOMO, ROSE PALERMO, DENISE TORKELSON, and SAMUEL TSOU, individually and on behalf of all others similarly situated,

*Plaintiffs*,

-against-

VANGUARD MARKETING CORPORATION; MORGAN STANLEY SMITH BARNEY LLC; PERSHING LLC and PERSHING ADVISOR SOLUTIONS LLC,

*Defendants*.

Case No. ___________________

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

## CLASS ACTION COMPLAINT

Plaintiffs Andrea Jordan, Elena Cigler, Laura Heit, Sam Shirey, Trent Berger, Gene Klipin, Diana Huack, Larry Petrey, Alan Dalewitz, Marsha DiGiacomo, Rose Palermo, Denise Torkelson, and Samuel Tsou, individually and on behalf of all others similarly situated, allege the following:

## I. INTRODUCTION

1. The Federal securities laws require securities issuers as well as broker-dealers,[1] investment advisers, and other market intermediaries (hereafter, collectively, "Industry Participants") to provide certain investment-related disclosures to investors. The purpose of these "regulatory disclosures" is to protect investors: they allow investors to verify the terms and costs

[1] A broker is any person or entity engaged in the business of buying or selling securities for the account of others. A dealer is any person engaged in the business of buying or selling securities, but for their own account. *See* SEC, "Broker-Dealers," https://www.sec.gov/resources-small-businesses/capital-raising-building-blocks/broker-dealers (last visited Jan. 16, 2026). For purposes of this Complaint, the term "broker" is used interchangeably with "broker-dealer."

of their transactions, alert them to potential conflicts of interest or misconduct, and safeguard them against fraud.[2]

2. For instance, under Federal law, brokers must provide confirmations of trades to their customers.[3] Brokers must also provide customers with account statements, at least quarterly.[4]

3. Since at least 1996, paper has been the default method of delivery for trade confirmations, customer account statements, and other regulatory disclosures in the securities industry.[5] Industry Participants were permitted to deliver these regulatory disclosures electronically only after obtaining an investor's informed consent, and upon providing the investor with notice of electronic delivery, effective access to the information delivered, and establishing evidence of delivery (*i.e.*, reason to believe that delivery of information electronically has resulted or would result in satisfaction of the delivery requirements under the Federal securities laws[6] and applicable rules governing the brokerage industry[7]).

---

[2] *See, e.g.,* Securities and Exchange Commission ("SEC"), Order Approving a Proposed Rule Change to Amend FINRA Rule 2231 (Customer Account Statements), as modified by Amendment No. 1 (Release No. 34-95018; File No. SR-FINRA-2021-024) (June 1, 2022), https://www.sec.gov/rules/sro/finra/2022/34-95018.pdf.

[3] *See* 17 C.F.R. §240.10B-10- Confirmation of Transactions; SEC Rule 10b-10. Trade confirmations contain key details about a customer's securities transactions, and a broker must issue a trade confirmation every time a customer buys or sells a security. *See generally* Financial Industry Regulatory Authority ("FINRA"), *Are You Checking Your Trade Confirmations?* (Nov. 21, 2024), https://www.finra.org/investors/insights/checking-trade-confirmations

[4] FINRA Rule 2231. Brokerage account statements contain a description of any securities positions, money balances, and account activity (including trades) in a customer's account since the previous account statement was sent. Account statements are distinct from trade confirmations. However, references to "account statements" in this Complaint should be interpreted, wherever applicable, to include trade confirmations, and *vice versa* – as brokers are required to provide both to their customers.

[5] *See* Electronic Delivery of Information Under the Federal Securities Laws ("Regulation E-Delivery"), SEC Rel. Nos. 33-11430; 34-105921; 39-2564; IA-6980, 91 Fed. Reg. 45884, 45885 (July 21, 2026) ("Currently, many required regulatory disclosures and reports under the Federal securities laws typically are delivered in paper, unless the person with a right to receive these disclosures and reports affirmatively elects otherwise.")

[6] *See id.* at 45886.

[7] *See* FINRA Rule 2231, Supplementary Material .03: Use of Electronic Media to Satisfy Delivery Obligations. *See also* FINRA Regulatory Notice 23-02: Amendments to FINRA Rule 2231, Supplementary Material .03 (Jan. 18, 2023). FINRA guidance regarding the use of electronic media to deliver customer account statements tracks the guidance of the SEC: "A member may satisfy its delivery obligations under this Rule by using electronic media, subject to compliance with standards established by the SEC on the use of electronic media for delivery purposes." FINRA Rule 2231.03.

4. For decades, the SEC[8] has maintained that "a person who has a right to receive a document under the federal securities laws and chooses to receive it electronically, should be provided with the information in paper form when specifically requesting paper."[9] This remains the position of the SEC today.[10]

5. This past July, the SEC proposed a significant shift in its guidance– one that would change the default form of regulatory disclosure delivery from paper to electronic format, and which would require firms to provide regulatory disclosures, when requested, for free. Titled Regulation E-Delivery, the proposal would make electronic delivery of regulatory disclosures the new default method of delivery, superseding prior guidance by the SEC and FINRA.[11]

6. Regulation E-Delivery affirmed that paper has been the default method of delivery for regulatory disclosures for decades.[12]

7. At the same time, Regulation E-Delivery would ban Industry Participants from charging fees for paper delivery of certain regulatory disclosures - including trade confirmations and account statements governed by conforming FINRA rules - whenever an investor chooses to receive delivery in paper format.[13]

---

[8] The SEC is the federal financial regulator charged with the oversight and enforcement of laws, rules, and regulations governing the securities industry, including broker-dealers. *See* SEC, Division of Trading and Markets, https://www.sec.gov/about/divisions-offices/division-trading-markets (last visited Jan. 16, 2026). FINRA is a self-regulatory organization for member broker-dealers, responsible for supervising its members pursuant to federal law under the oversight of the SEC. *See* FINRA, "How We Carry out Our Mission," https://www.finra.org/about (last visited Sept. 2, 2026).

[9] *See* Interpretation, Solicitation of Comments, Use of Electronic Media by Broker-Dealers, Transfer Agents, and Investment Advisers for Delivery of Information; Additional Examples Under the Securities Act of 1933, Securities Exchange Act of 1934, and Investment Company Act of 1940, ("SEC Electronic Media Release"), 61 Fed. Reg. 24644 (May 15, 1996). *See also* SEC, Interpretation, Solicitation of Comment, Use of Electronic Media, ("SEC Electronic Media Release 2"), 65 Fed. Reg. 25843, 25846 (May 4, 2000) ("[A]n investor should be advised of his or her right to revoke the consent [to electronic delivery] at any time and receive all covered documents in paper format.")

[10] Regulation E-Delivery, 91 Fed. Reg. 45928, n. 330 ("Section 303.102(c)(1)(v)(D) of Reg E-Delivery… would require a… description of the process to request paper copies that provides, at a minimum, a website through which the *right to obtain a paper copy can be exercised*.") (emphasis added).

[11] *See* Regulation E-Delivery, 91 Fed. Reg. at 45885; FINRA Rule 2231, Supplementary Material .03: Use of Electronic Media to Satisfy Delivery Obligations. *See also* FINRA Regulatory Notice 23-02: Amendments to FINRA Rule 2231, Supplementary Material .03 (Jan. 18, 2023).

[12] Regulation E-Delivery, 91 Fed. Reg. at 45886 ("Because of the guidance regarding informed consent, issuers and market intermediaries generally deliver regulatory documents and reports in paper format unless the recipient consents or 'opts in' to e-delivery.")

[13] Regulation E-Delivery, 91 Fed. Reg. 45897-8 (listing brokerage trade confirmations among the regulatory disclosures covered by Regulation E-Delivery). *See also id.* at 45886 (Regulation E-Delivery would provide "the ability to opt out of e-delivery and promptly receive regulatory disclosures and reports in paper, free of charge").

8. While acknowledging that Industry Participants have, in the past, charged fees for paper delivery of regulatory disclosures, the SEC determined to ban these fees on the grounds that they are restrictive, and that they should not deter or impede an investor's choice in determining how to receive critical information about their investments.[14]

9. The SEC's proposed Regulation E-Delivery is not unprecedented, however. Since 2014, New York law has more broadly prohibited any business from requiring consumers to pay fees to receive a paper statement.[15]

10. In adopting General Business Law Section 399-zzz, the New York legislature rejected the unfairness of these fees, along with the disproportionate impact and burden the fees have on lower income and senior citizen consumers.[16]

11. Defendants, all brokers registered with the SEC and FINRA, historically provided free paper account statements and trade confirmations to their customers upon request. In the last decade, however, each of these Defendants began charging customers to receive paper versions of these disclosures, without informing customers of their right to receive the disclosures in paper form.

12. This practice violates New York law and longstanding Federal regulatory guidance. The fees unfairly affect customers who prefer to receive investment information in paper, and/or impede their ability to determine the manner in which they receive important investment information.

13. Defendants have acted deceitfully in imposing these illegitimate fees on customers. Some Defendants willfully deceive customers by portraying fees for paper account statements as necessary for the general servicing of their accounts. Vanguard, for instance, refers

---

According to the proposal, Regulation E-Delivery may also apply to customer account statements to the extent a self-regulatory organization "provides that members may deliver information electronically so long as its compliant with Commission E-Delivery Guidance," as FINRA Rule 2231 currently provides. *See id.* at 45898, citing FINRA Rule 2231.03 (governing the delivery of customer account statements). *See also infra*, n. 7.

[14] Regulation E-Delivery, 91 Fed. Reg. 45910, 45960.

[15] *See* NY Gen. Bus. Law Section 399-zzz- Prohibition of certain fee charges (Sept. 22, 2014).

[16] State of New York, Chapter 556, Senate Bill 7296-A, at 000007 (Mar. 29, 2010), available at https://digitalcollections.archives.nysed.gov/media/collectiveaccess/images/2/6/5/45947_ca_object_representations_media_26505_original.pdf.

to the charge as an "account service fee"[17] – even though the fee is only imposed on customers with lower-value accounts who request paper statements.

14. Regardless of how Defendants label the fees, they are, in effect, a penalty on customers that choose paper delivery. The fees can only be avoided by opting in to electronic delivery.

15. In their brokerage agreements with customers, Defendants have and continue to represent that they are members of FINRA, and most Defendants promise investors they will provide regulatory disclosures in accordance with SEC and FINRA guidance. Defendants' customers therefore reasonably expect their brokers to abide by this representation. They do not expect Defendants to exercise arbitrary discretion over their contractual terms in bad faith.

16. Defendants provided customers with no explanation for the newly imposed paper statement fees. Nor did they advise customers of their right to receive paper statements. Defendants simply seized the opportunity to capitalize on a new source of proceeds that – to the average investor, might have caused a mere nuisance. In the aggregate, however, taking into account all regulatory disclosures,[18] the fees that Industry Participants have imposed on investors for paper delivery are likely astronomical.

17. Defendants' willful imposition of fees for paper statements violates New York's General Business Law Section 399-zzz, pursuant to which each charge for a paper account statement constitutes a deceptive act and practice subject to private action and penalty under New York's Unfair and Deceptive Practices Act.

18. On information and belief, Defendants perpetrated this deceptive conduct against individuals sixty-five years and older, either aware that the conduct was directed to one or more elderly persons or that it was in willful disregard of the rights of one or more elderly persons.

---

[17] *See* Vanguard, E-Delivery: Safe & Convenient Access, ("[A]nd while you're helping us save money by reducing paper and postage, you may lower your own costs by eliminating some account service fees."), https://investor.vanguard.com/client-benefits/edelivery-paperless, last visited Jan. 2, 2026.

[18] This Complaint focuses on the fees that brokers charge customers who choose to receive paper account statements or trade confirmations. However, Plaintiffs reserve the right to name additional Defendants that have unlawfully charged investors for paper delivery of other regulatory disclosures.

19. Similarly, Defendants' bad faith abuse of unequal contractual discretion – used to collect unlawful fees from plaintiffs – constitutes a breach of the implied covenant of good faith and fair dealing.

20. Plaintiffs, through this action, seek to hold Defendants and other yet-unnamed Industry Participants engaged in this unlawful practice accountable for their violation of New York law, and for their flagrant disregard of investor rights.

## II. JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because at least one class member is of diverse citizenship from the Defendants, there are more than 100 class members, and upon information and belief, the aggregate amount in controversy exceeds $5,000,000.

22. This Court also has subject matter jurisdiction over this action despite the pre-dispute arbitration clauses in Defendants' account agreements. Defendants, as broker-dealers and members of FINRA, are bound by FINRA Rules, including FINRA's Code of Arbitration Procedure for Customer Disputes (the "FINRA Code").[19] The FINRA Code prohibits class actions from being arbitrated, and allows brokerage customers to participate in class action lawsuits.[20]

23. This Court has personal jurisdiction over Plaintiffs because they submit to this Court's jurisdiction.

24. This Court has personal jurisdiction over Morgan Stanley Smith Barney LLC ("Morgan Stanley") because it is headquartered in New York, New York.

[19] *See* FINRA Rule 12101 ("The Code applies to any dispute between a customer and a member or associated person of a member that is submitted to arbitration under Rule 12200[.]"); FINRA Rule 12200 (Parties must arbitrate a dispute under the Code if Arbitration under the Code is required by written agreement or requested by the customer, the dispute is between a customer and broker, and the dispute arises in connection with the broker's business activities).

[20] FINRA Rule 13204(a) states that "Class action claims may not be arbitrated under the Code." FINRA Rule 12204(d) prohibits brokers from enforcing an arbitration agreement against a member of a certified or putative class action with respect to any claim subject to the certified or putative class action. FINRA Rule 2268 prohibits pre-dispute arbitration agreements from contradicting FINRA Rules or limiting a party's ability to file a claim in court that would be permitted under FINRA Rules. The operative effect of these Rules is that brokers can be the subject of class action lawsuits initiated by their customers.

25. This Court has personal jurisdiction over Vanguard because it has extensive and significant business contacts and activity with and in New York. Vanguard extensively markets its products to New York-based investors, manages tens of billions of assets under management belonging to New York residents and New York-domiciled entities, is registered as a broker-dealer in New York, and has selected New York law to govern its brokerage account agreements.

26. This Court has personal jurisdiction over Pershing LLC and Pershing Advisor Solutions LLC (hereafter, together, "Pershing"), because both entities have extensive and significant business contacts and activity with and in New York. Pershing extensively markets its services to New York-based financial service providers and their customers, many of whom are New York residents. Pershing and Pershing Advisor Solutions are both registered as broker-dealers in New York. Pershing's parent company, the Bank of New York Mellon, is headquartered in New York.

27. Venue is proper in this District under 28 U.S.C. § 1391 because the events that gave rise to the claims occurred in substantial part in this District.

## III. CHOICE OF LAW

28. New York law governs the substantive legal issues in this matter.

29. Plaintiff Denise Torkelson's account agreement with Morgan Stanley Wealth Management does not mention a governing law clause. However, Morgan Stanley is a New York-headquartered company and is therefore bound by New York consumer protection laws. Plaintiff Samuel Tsou's account agreement with E*Trade from Morgan Stanley provides that it is governed by the laws of the State of New York.

30. Defendant Vanguard's standardized Brokerage Account Agreement, to which Ms. Jordan, Ms. Palermo, and all Vanguard Class members assented, provides that all matters arising in connection with the Agreements will be governed by, and construed and enforced in accordance with, the laws of the State of New York.

31. Pershing's standardized agreement with brokerage customers, to which Plaintiffs Marsha DiGiacomo and Alan Dalewitz assented, provides that it will be governed by the laws of the State of New York, irrespective of any conflict of laws analysis.

32. New York General Obligation Law Section 5-1401 states that "The parties to any contract… may agree that the law of this state shall govern their rights and duties in whole or in part, whether or not such a contract… bears a reasonable relation to this state."

## IV. PARTIES

### A. Plaintiffs

33. Plaintiff Andrea Jordan is a resident of Iowa who has had a Vanguard brokerage account since 2015 and who has been charged for requesting paper statements.

34. Plaintiff Rose Palermo is a resident of New York who has had a Vanguard brokerage account since at least 1995 and who has been charged for requesting paper statements.

35. Plaintiff Elena Cigler is a resident of Illinois who has a Vanguard brokerage account and who was forced to switch to electronic statements because of Vanguard's fees.

36. Plaintiff Laura Heit is a resident of Florida who has a Vanguard brokerage account and who has been charged for paper statements

37. Plaintiff Sam Shirey is a resident of North Carolina who has several Vanguard brokerage accounts and was forced to switch to electronic statements because of Vanguard's fee, but who pays to print his statements at a copy shop each month.

38. Plaintiff Trent Berger is a resident of Virginia who has had several Vanguard brokerage accounts and who has been charged for requesting paper statements.

39. Plaintiff Gene Klipin is a resident of Illinois who has had a Vanguard brokerage account and was forced to switch to electronic statements because of Vanguard's fee in 2022.

40. Plaintiff Diana Hauck is a resident of Louisiana who has had a Vanguard brokerage account and has been charged for requesting paper statements.

41. Plaintiff Larry Petrey is a resident of Kentucky who has a Vanguard brokerage account and who has been charged for requesting paper statements.

42. Plaintiff Alan Dalewitz is a resident of New York. He is executor of the Investment Retirement Account (IRA) for his late sister-in-law, Rose Weinstein, whose account is custodied at Pershing. Pershing, by and through Ms. Weinstein's broker, HJ Sims, has charged Ms. Weinstein's IRA account fees for paper statements. Mr. Dalewitz has paid these paper statement fees from, and on behalf of, Ms. Weinstein's account.

43. Plaintiff Marsha DiGiacomo is a resident of the state of New York. Pershing is the custodian and clearing broker for her brokerage account with Financial Northeastern Company ("Northeastern"). Pershing, by and through Northeastern, has forced Mrs. DiGiacomo to pay fees for requesting paper statements.

44. Plaintiff Denise Torkelson is a California resident who holds an account with Morgan Stanley Wealth Management. Samuel Tsou is a California resident who holds an account with E*Trade from Morgan Stanley. Despite their preference to receive paper statements, both Ms. Torkelson and Mr. Tsou opted in to electronic delivery of their account statements – against their will - to avoid being penalized for requesting paper statements.

**B. Defendants**

45. Defendant Morgan Stanley, which conducts business under the alternate names Morgan Stanley Wealth Management and E*Trade from Morgan Stanley, is a broker-dealer registered with the SEC and FINRA. It is headquartered in New York, New York. In this Complaint, Plaintiffs refer to and distinguish the conduct of Morgan Stanley by its alternate business names, but all omissions and acts described herein are those of Morgan Stanley.

46. Defendant Vanguard Marketing Corporation, which conducts business under the alternate name Vanguard Brokerage Services ("Vanguard"), is a broker-dealer registered with the SEC and FINRA. It is headquartered in Malvern, Pennsylvania.

47. Defendants Pershing and Pershing Advisor are broker-dealers registered with the SEC and FINRA. They are headquartered in Jersey City, New Jersey. The Bank of New York Mellon Corporation, headquartered in New York, is the ultimate parent of Pershing and Pershing Advisor.

## V. FACTUAL ALLEGATIONS

### A. Brokerage account statements provide valuable consumer protections and are required under federal law and securities industry rules.

48. Defendants Morgan Stanley and Vanguard are brokers that facilitate the buying and selling of securities for Plaintiffs as investors and brokerage customers. Because Plaintiffs entrust the Defendants to perform this critical function on their behalf, Plaintiffs' right to access and review their account statements is critical: the statements allow Plaintiffs to understand and monitor their investments and to protect themselves from fraud and broker misconduct.

49. Defendant Pershing provides clearing, custody, and other services for broker-dealers with direct customer relationships. As a clearing broker, Pershing acts as a middleman between buyers and sellers of securities, ensuring trades are properly executed, settled, and recorded. As a custodian, broker-dealers entrust Pershing with the custody of their customer assets. In this capacity, Pershing generates and provides regulatory disclosures – including trade confirmations and account statements – for customer accounts held in its custody.

50. Pursuant to the Securities Exchange Act of 1934 (the "Exchange Act"), the federal Act governing the brokerage industry, brokers must regularly notify their customers in writing of every purchase or sale of a security. SEC rules, promulgated under the Exchange Act, require the same.[21]

51. FINRA also requires brokers to send customers accurate account statements at least quarterly.[22] As stated in FINRA Regulatory Notice 23-02[23]:

> Customer account statements enable customers to monitor and verify the transactions occurring in the customer's account. Thus, customers may discover inaccuracies or discrepancies in their accounts, and potentially, unauthorized transactions or financially exploitative activities that have occurred in their accounts.

---

[21] *See* 17 CFR § 240.10b-10 – Confirmation of Transactions; SEC Rule 10b-10.

[22] *See* FINRA Rule 2231(a).

[23] FINRA, Regulatory Notice 23-02, Customer Account Statements (Jan. 18, 2023).

**B. Under existing SEC and FINRA guidance, brokerage customers should receive account statements and other regulatory disclosures in paper form on request.**

52. In 1996, the SEC stated that, where a person has a right to receive a document under the federal securities laws, the document should be provided in paper form whenever the person so chooses.[24] This guidance remains in effect today.

53. Under existing SEC and FINRA guidelines, brokers may only discontinue the delivery of paper statements if they receive a customer's affirmative, informed consent to receive their account statements electronically,[25] and even after receiving that consent, brokers must make paper delivery available upon request if the consent is revoked.[26]

54. FINRA rules follow the SEC's requirement that customers must provide informed consent to receive electronic delivery of their account statements, as paper remains the default method of delivery.[27]

**C. Brokers must honor customers' preferences for paper delivery.**

55. Previous SEC guidance on electronic delivery relied on the idea that internet access was not yet universal, and that, when information was delivered on paper through postal mail, recipients were more likely aware that they had received important information to review. Information transmitted electronically would provide less notice to customers that they had received important information.[28] For this reason, the SEC suggested that brokers consider supplementing electronic delivery with additional communications to ensure customers received sufficient notice of the electronic delivery.[29]

[24] SEC Electronic Media Release, 61 Fed. Reg. at 24646.

[25] SEC Interpretation, Solicitation of Comment: Use of Electronic Media for Delivery Purposes, SEC Release Nos. 33–7288, 34–36345; IC–21399; File No. S7–31–95, 60 Fed. Reg. 53458, 53461 n.29 (Oct. 13, 1995).

[26] SEC Electronic Media Release, 61 Fed. Reg. at 24647, n. 23 ("In addition, if the broker-dealer, transfer agent, or investment adviser is relying on the consent to ensure effective delivery and the intended recipient revokes the consent, future documents should be delivered in paper").

[27] FINRA Rule 2231, Supplementary Material .03: Use of Electronic Media to Satisfy Delivery Obligations. *See also* FINRA Regulatory Notice 23-02: Amendments to FINRA Rule 2231, Supplementary Material .03 (Jan. 18, 2023).

[28] *See* SEC Interpretation, Solicitation of Comments, Use of Electronic Media by Broker-Dealers, Transfer Agents, and Investment Advisers for Delivery of Information; Additional Examples Under the Securities Act of 1933, Securities Exchange Act of 1934, and Investment Company Act of 1940, ("SEC Electronic Media Release"), 61 Fed. Reg. 24644 (May 15, 1996).

[29] *Id.*

56. Regulation E-Delivery, the SEC's proposed rule, would switch the default format of delivery from paper to electronic delivery. The proposal relies largely on studies showing that nearly all areas of the U.S. now have access to advanced telecommunications capability through high-speed broadband or satellite services.[30]

57. However, the through-line across prior SEC guidance and the Regulation E-Delivery remains that personal choice should govern the manner in which an investor receives important information about their accounts or investments. The SEC states in Regulation E-Delivery that "preferences for delivery in paper format should be honored."[31] As such, the proposal would require Industry Participants to provide free paper copies of regulatory disclosures, thereby avoiding the "risk that fees or restrictive policies could deter recipients from obtaining important information."[32]

58. The SEC acknowledges that investors have legitimate bases to choose paper delivery. Some may prefer to view and share information in paper or prefer the physical reminder and convenience of paper. Others might have limited or no access to a printer.[33]

59. The risk also remains that investors might not receive, read, or respond to electronically delivered information, which could land in a spam folder or get lost in a mass of emails.[34]

60. Additionally, e-delivery continues to present privacy and cybersecurity risks – particularly those associated with missed or misdirected e-delivery of personal financial information.

61. Brokers themselves acknowledge that communication of personal financial information through the internet poses significant risks, including the risk of third parties

[30] Regulation E-Delivery, 61 Fed. Reg. at 45888.

[31] *Id.* at 45892.

[32] *Id.* at 45960.

[33] *Id.* at 45893.

[34] *Id.*

obtaining unauthorized access to a customer's online account, cybersecurity vulnerabilities, systems outages, delays and disruptions in telecommunications services and/or the internet.[35]

62. Finally, brokers provide only limited electronic access to historical account documents. For instance, E*Trade from Morgan Stanley guarantees access to an archive of electronic account documents for "at least the current year."[36] Customers in need of account documents dating beyond the broker's archive period must find other ways of obtaining these documents, whereas customers who receive paper documents may access and retain those documents without temporal limitation.

63. As a case in point, if a brokerage customer passes away or becomes incapacitated, the lack of a physical paper trail for the decedent's accounts could delay the estate settlement process and potentially lead to investment losses.

64. New York law prohibits businesses from charging fees for paper statements.

65. New York explicitly prohibits business entities from charging fees for paper statements. Section 399-zzz of New York's General Business Law provides that:

> [N]o… business entity shall charge a consumer an additional rate or fee or a differential in the rate or fee associated with payment on an account when the consumer chooses to pay by United States mail or receive a paper billing statement. This subdivision shall not be construed to prohibit a… business entity from offering consumers a credit or other incentive to elect a specific payment or billing option.

66. New York State Senator Jose Peralta, the law's sponsor, echoed many of the above-mentioned sentiments in his sponsor memorandum justifying the bill:

> In recent months, there have been instances of major companies proposing to impose an additional fee on the accounts of customers that choose to receive a paper bill…. Such paper billing and payment fees unfairly impact those consumers that do not have Internet access in their homes, as well as, those that are uncomfortable using the Internet, including many senior citizens and those concerned about personal privacy.
>
> Paper billing and payment fees disproportionately affect low-income consumers who are less likely to have access to the Internet. Furthermore, such policies impose an additional burden on those customers who choose to file their billing

[35] *See, e.g.,* E*Trade from Morgan Stanley Client Agreement for Self-Directed Accounts at ¶17 (May 20, 2026), available at https://us.etrade.com/l/f/agreement-library/client-agreement.

[36] *Id.*

statements for later reference, as such customers will be forced to bear the cost of printing electronic billing statements on their home printer.[37]

### D. New York law imposes an additional penalty for violations of consumer protection statutes such as GBL 399-zzz when the victims are elderly persons.

67. New York GBL 349-C provides that additional penalties of up to ten thousand dollars may be imposed when defendants engage in prohibited deceptive conduct against individuals sixty-five years and older, particularly when "the defendant knew that the defendant's conduct was directed to one or more elderly persons or whether the defendant's conduct was in willful disregard of the rights of an elderly person."

### E. Vanguard Allegations:

#### 1. Despite historically providing paper account statements free of charge, Vanguard began charging a growing population of customers increasing fees for paper statements.

68. The Vanguard Plaintiffs' 2017 Brokerage Account Agreement, effective September 5, 2017, ("2017 Vanguard Agreement") acknowledged paper delivery as the default means of delivery for customer account statements. For instance, the Agreement specifically required customers to provide consent before receiving electronic delivery of records and regulatory information. The 2017 Vanguard Agreement also required customers to agree that Vanguard could "combine communications such as account statements… in a manner that *reduces the number of envelopes mailed* to [y]ou." (emphasis added).

69. Since at least August 21, 2018, Vanguard began charging a $20 annual "account service fee" for each brokerage customer's account, unless the customer held at least $10,000 in Vanguard funds and ETFs, or if they elected e-delivery of statements and other documents.[38]

70. Beginning on or around January 25, 2021, Vanguard's brokerage account holders could also avoid the $20 "account service fee" if they held at least $50,000 in qualifying

---

[37] State of New York, Chapter 556, Senate Bill 7296-A, at 000007 (Mar. 29, 2010), available at https://digitalcollections.archives.nysed.gov/media/collectiveaccess/images/2/6/5/45947_ca_object_representations_media_26505_original.pdf.

[38] *See* Vanguard, Brokerage Services Commission and Fee Schedules (effective August 21, 2018) at 7, https://web.archive.org/web/20181011171737/https:/personal.vanguard.com/pdf/v414.pdf?2210079054 (last visited June 7, 2026).

Vanguard assets – or if they agreed to accept electronic delivery of their statements and other important documents.[39]

71. Although Vanguard deceptively termed this $20 fee an "account service fee," the fee was solely attributable to the delivery of paper statements: customers with fewer assets could not receive paper statements without paying the fee.

72. Over the next several years, Vanguard increased both the amount of assets needed to avoid this fee and the fee itself – entirely without justification. Consequently, an ever-larger percentage of Vanguard customers were required to pay to receive paper statements, providing Vanguard with increasing proceeds from these fees.

73. Starting on or around September 5, 2022, Vanguard increased the minimum threshold to avoid the "account service fee" to $1 million.[40] On information and belief, a significant percentage of Vanguard brokerage customers had less than $1 million in assets in their brokerage accounts. Customers who preferred paper delivery were either pressured through threat of fees to accept electronic delivery, or they paid the $20 "account service fee" to receive paper delivery.

74. On or around July 1, 2024, Vanguard increased the "account service fee" for brokerage accounts and mutual fund-only accounts to $25 per year. Vanguard also increased the minimum threshold for exemption from these "account service fees" to $5 million in qualifying Vanguard assets.[41]

---

[39] Vanguard, Brokerage Services Commission and Fee Schedules, (effective Jan. 25, 2021), at 7, https://web.archive.org/web/20210129091414/https:/personal.vanguard.com/pdf/v414.pdf?2210079054 (last visited June 7, 2026). Dinah Wisenberg Brin, *Vanguard: Avoid $20 Fee with $1M in Assets, E-Delivery*, ThinkAdvisor (Aug. 18, 2022), https://www.thinkadvisor.com/2022/08/18/vanguard-avoid-20-fee-with-1m-in-assets-e-delivery/ (last visited June 7, 2026).

[40] Vanguard, Brokerage Services Commission and Fee Schedules, (effective Sept. 5, 2022), at 7, https://personal.vanguard.com/pdf/v414.pdf?2210079054. *See also* Dinah Wisenberg Brin, *Vanguard: Avoid $20 Fee with $1M in Assets, E-Delivery*, ThinkAdvisor (Aug. 18, 2022), https://www.thinkadvisor.com/2022/08/18/vanguard-avoid-20-fee-with-1m-in-assets-e-delivery/ (last visited June 7, 2026).

[41] Vanguard, Brokerage Services Commission and Fee Schedules, (effective July 1, 2024), at 7, https://storage.ghost.io/c/b3/27/b3271a4b-f1ad-4f4b-b0fd-eae040041e8f/content/files/2024/05/VanguardBrokerage-FeeSchedule-for-July2024.pdf (last visited June 7, 2026).

75. The five-fold increase in minimum qualifying assets virtually ensured that most Vanguard customers would be subject to the new $25 service fee per account, which itself reflected a twenty-five per cent increase from the $20 service fee initially imposed.

76. Vanguard has provided customers with no justification or explanation for the increase in minimum qualifying assets or the increase in annual service fee. Nor has it explained what "account services" are actually paid for by these "account services fees."

**2. Vanguard knowingly violated New York consumer protection laws by charging fees for paper account statements.**

77. Vanguard's "account service fee" is plainly a fee for the delivery of paper statements. Such fees constitute a deceptive business practice and a violation of New York General Business Law Section 399-zzz. Vanguard is charging its less "valuable" customers for requesting paper delivery. The only way for such customers to avoid the charge is to agree to receive statements electronically (or to increase the qualifying assets in their accounts). Vanguard is not providing any incentive or credit to customers who opt in to electronic delivery. Rather, by agreeing to receive their statements electronically, customers with less than $5 million in qualifying Vanguard assets are merely avoiding Vanguard's penalty for requesting paper delivery.

78. Additionally, Vanguard knowingly engaged in deceptive conduct against individuals aged sixty-five and older and should therefore be subject to the additional civil penalty for frauds against elderly persons under New York law. Upon information and belief, a large portion of Plaintiffs represented by this class are sixty-five years old or older. Vanguard knows its customers' ages because customers must enter their birth dates, along with other personally identifying information, to open a brokerage account.

**3. Vanguard knowingly defied federal guidelines and deceived brokerage customers by making account statements more difficult and expensive to access.**

79. In Vanguard's past and present brokerage agreements, Vanguard promises to comply with the SEC/FINRA regulatory framework governing trade confirmations and account statements, including the standards those regulators publish to define compliant practices.

80. Vanguard's brokerage agreements state: "[Vanguard] will provide You with written confirmation of trades that are executed in Your Account as required under SEC, FINRA, or applicable self-regulatory organization (SRO) rules."

81. In addition to recognizing customers' right to receive account statements in paper format, the SEC and FINRA require brokers to ensure that customers can easily access their account statements. For instance, the SEC's 2000 Release regarding use of electronic media for delivery expressed concern that "the use of a particular medium should not be so burdensome that intended recipients cannot effectively access the information provided," such as where a document is delivered in PDF format and cannot be accessed without special software.[42] The SEC further stated:

> We believe that issuers and market intermediaries delivering documents electronically *may use PDF if it is not so burdensome as effectively to prevent access*. For example, PDF could be used if issuers and intermediaries: inform investors of the requirements necessary to download PDF when obtaining consent to electronic delivery; *and provide investors with any necessary software and technical assistance at no cost*." (emphasis added)[43]

82. Vanguard acknowledges that viewing its electronically delivered statements requires PDF software, but the firm neither provides that software nor offers the technical assistance that SEC guidelines require. Instead, Vanguard's "Consent agreement for electronic delivery" ("Consent Agreement") states:[44]

---

[42] SEC Electronic Media Release 2"), 65 Fed. Reg. at 25846.

[43] *Id.*

[44] Notably, the Vanguard Brokerage Services Consent Agreement contains additional language applicable to owners of the Vanguard Variable Annuity who reside in California, Georgia, and Utah, which allows those customers to request paper copies of documents at any time for no charge. Plaintiff reserves the right to amend this Complaint to include other defendants engaged in the unlawful practice of charging fees for paper disclosures under other state laws.

- All of the documents available via e-delivery are available only in portable document format (PDF). You must have PDF viewing software, such as Adobe Reader, installed on your computer in order to view account documents available via e-delivery.
- If you don't have Adobe Reader or are otherwise unable to view or print information on our website, do not accept this agreement.[45]

83. Rather than ensuring its customers can easily access their account statements, Vanguard shifts the burden of access onto its customers. Customers without PDF software are precluded from opting in to electronic delivery and therefore forced to pay paper statement fees.

84. Vanguard's customers reasonably and in good faith expected it to abide by its contractual representation to provide account statements in accordance with SEC and FINRA guidance. Its customers did not contemplate that Vanguard would benefit – at their expense – from its knowing circumvention of the SEC's pronouncement that they have a right to paper statements, or the SEC's guidance establishing paper as the default method of delivery, or the SEC's guidance that Vanguard make statements maximally accessible to customers at no cost.

**4. Vanguard knowingly mislabeled paper statement fees "customer account fees."**

85. Vanguard deceived customers by mislabeling the paper statement fee as an "account service fee."

86. In reality, Vanguard is not providing any "account services." The fees are used to pressure investors to accept electronic delivery of documents that Vanguard is federally required to provide and to give Vanguard a significant, separate stream of money from investors who prefer to receive these documents on paper. These same investors are unaware that *paper* is the default delivery method under Federal guidelines.

87. In referring to the paper statement fees as "account service fees," Vanguard sought to avoid regulatory scrutiny of these charges. Worse, Vanguard sought to capitalize on its customers' lack of awareness that they had a right to receive paper statements.

[45] Vanguard, Consent Agreement for Electronic Delivery, https://investor.vanguard.com/client-benefits/edelivery-paperless/consent-agreement-for-edelivery (last visited Jan. 16, 2026).

88. Investors who pay to receive paper statements likely view the fees as a nuisance. But in the aggregate, the fees could constitute an astronomical windfall for Vanguard.

89. The so-called "account service fees" serve no purpose other than to generate proceeds for Vanguard and to penalize customers who choose to receive their account statements in paper format.

**5. Since 2022, Vanguard Plaintiffs have either paid Vanguard "account service fees" to continue receiving paper statements, or they have been unwillingly forced to accept electronic statements.**

90. Vanguard Plaintiffs Andrea Jordan, Laura Heit, Rose Palermo, Trent Burger, Diana Hauck, and Larry Petrey are all Vanguard brokerage account holders who were required to pay an "annual account service fee" of twenty-five dollars unless they agreed to electronic delivery of all account-related statements and materials. Each of these Plaintiffs, and all Vanguard customers similarly situated, continue to pay this fee to receive the paper statements that New York law requires them to receive for free. For individuals with multiple accounts, the upfront and related costs can be significant. Mr. Berger, for instance, was forced to pay $75 to receive paper statements for his three accounts. After he lost his job, the $25 fee for one of his accounts caused his placeholder account to overdraw, locking him out of his account and resulting in a late credit card payment.

91. Vanguard Plaintiffs Gene Klipin, Sam Shirey, and Elena Cigler were similarly required to pay an account service fee to continue receiving paper statements. Although Mr. Klipin, Mr. Shirey, and Ms. Cigler would have preferred receiving paper statements, they, and all similarly situated Vanguard class members, were forced to opt in to electronic delivery of their statements based on the cost – Mr. Shirey would have had to pay upwards of $300 based on his accounts. Each of these Plaintiffs continues to suffer an injury: Mr. Shirey, for example, treks to a copy shop every month and pays to have his statements printed there.

## F. Allegations regarding Pershing.

### 1. Pershing forces brokers to charge customers fees for paper statements, and to remit these fees back to Pershing.

92. Pershing LLC ("Pershing"), a broker-dealer registered with FINRA, acts as the custodian, or holder of assets, for brokerage customer accounts, and as a clearing broker. Pershing Advisor Solutions LLC ("Pershing Advisor") is a broker-dealer registered with FINRA and an affiliate of Pershing. Pershing Advisor acts as an introducing broker to Pershing, which maintains and custodies customer accounts and clears trades for brokerage customer accounts.

93. Neither Pershing nor Pershing Advisor manage customer accounts or provide investment advice. Rather, customer accounts are managed, and customers receive investment advice from brokers and other financial professionals that introduce the customer account to Pershing.

94. As brokers and members of FINRA, Pershing and Pershing Advisor are subject to the regulatory framework of FINRA and the SEC.

95. In or around 2016, Pershing established NetXInvestor, an online offering that enabled brokerage customers to view, download, or print brokerage account statements, trade confirmations, and other documents for free through its website.[46]

96. The "Pershing NetXInvestor- Going Paperless FAQs" state that a surcharge of $1.00 will be incurred for every statement or trade confirmation that is printed and physically mailed.[47] As indicated in the footer, the FAQs were for "broker-dealer use only," not intended for distribution to customers.

97. The FAQs state that brokerage customers must pay the fees assessed for any paper statements or trade confirmations. Each monthly paper account statement would be assessed a $1.00 surcharge, and each trade confirmation printed and physically mailed would

---

[46] *See* https://www.bny.com/pershing/us/en/platforms/netx.html.

[47] *See, e.g, Pershing NetXInvestor -Going Paperless FAQs*, (July 19, 2016), https://s3.amazonaws.com/static.contentres.com/media/documents/98e11fb4-45b0-4e08-a603-e621b9757857.pdf (last visited August 3, 2026).

incur the $1.00 surcharge. For confirmation surcharges, the fee would be calculated as part of the trade and will be disclosed in the "service charge" field in addition to the confirmation fee.[48]

98. Brokerage customers seeking to avoid paying these fees must opt in to electronic delivery of account statements and other documents.

99. Further, the FAQs prohibit brokers and other financial organizations from absorbing the fees for their customers' paper account statements. Instead, Pershing requires brokers to assess these paper account statement fees directly to their customers, then remit payment for these fees back to Pershing.[49]

**2. Pershing knowingly violated regulatory guidelines and New York consumer protection laws by forcing brokers to charge customers fees for paper statements.**

100. As of at least 2016, to conduct business with Pershing, brokers have been forced to charge customers fees for paper account statements and paper trade confirmations on Pershing's behalf. Brokers are merely the middlemen through which Pershing imposes paper fees on customers; Pershing reaps the monetary benefit from these fees.

101. Pershing's imposition of fees for paper trade confirmations and account statements constitutes a deceptive business practice and violation of New York law, General Business Law Section 399-zzz. Customers subject to Pershing's fees are likely unaware that federal regulators recognize their right to receive these documents in paper format, or that paper has been the default delivery method for decades. The only way for customers to avoid Pershing's fees is to consent to electronic delivery. Pershing provides no incentive or credit to customers who opt in to electronic delivery. Rather, customers who receive their trade confirmations and statements electronically merely avoid the penalty for requesting paper copies.

102. Additionally, Pershing knowingly engaged in deceptive conduct against individuals aged sixty-five and older and should therefore be subject to the additional civil penalty for frauds against elderly persons under New York law. Upon information and belief, a

[48] *Id.*

[49] *Id.*

large portion of Plaintiffs represented by this class are sixty-five years or older. Pershing knows customers' ages because customers must enter their birth dates, along with other personally identifying information, to open a brokerage account.

**3. Pershing misrepresented that customers' investment advisors assessed paper statement fees. Pershing imposed these fees and reaped the proceeds from them.**

103. The "Terms and Conditions of Your Brokerage Custody Account" (the "Pershing Agreement") outlines the terms and conditions of the agreement between Pershing Advisor and the brokerage customer.[50]

104. The Pershing Agreement states that investor consent must be obtained before account documents can be sent by electronic delivery. For instance, it first states that "communications may be sent to You at your current postal or electronic mail address on file at Pershing Advisor Solutions."[51]

105. Later, the Agreement provides instructions for a customer to affirmatively consent to electronic delivery of all "Account Communications," which include trade confirmations and account statements.[52]

106. While the Pershing NetXInvestor- Going Paperless FAQs *require* brokers to assess paper statement fees to customers and to pass those profits on to Pershing, the Pershing Agreement falsely states that "*your investment advisor, not Pershing Advisor Solutions,* is responsible for… determining the initial and ongoing appropriateness of all such fees that may be charged to your Account(s). Pershing Advisor Solutions does not mandate or determine the fees or other charges that your Investment Advisor(s) may charge for management of your Account(s)."[53]

[50] *See* Pershing Agreement (September 2023) at 5, available at https://www.pershing.com/content/dam/pershing/documents/pdfs/disclosures/pas-terms-and-conditions.pdf.

[51] *See* Pershing Agreement dated September 2023 at 5, available at https://www.pershing.com/content/dam/pershing/documents/pdfs/disclosures/pas-terms-and-conditions.pdf.

[52] *Id.* at 6.

[53] *Id.* at 2.

107. Pershing acted deceitfully by misrepresenting to brokerage customers that their "*investment advisor, not Pershing Advisor Solutions*" determines whether to impose fees, and that certain fees *may be* charged for "management of your Account(s)." To the contrary, Pershing forced brokers to charge customers fees for paper statements and trade confirmations, then required brokers to remit those profits back to Pershing.

**4. Pershing knowingly defied federal guidelines and deceived brokerage customers by making account statements more difficult and expensive to access.**

108. Like Vanguard, the Pershing Agreement states that account communications, which include account statements, will be provided in PDF format, HTML, or other compatible formats. The Pershing Agreement requires the customer to "affirm that You have installed a recent version of Adobe Acrobat Reader or other software application that enables You to view and print your Account Communications." Therefore, if a customer lacks the necessary software to view and print their account statements and other communications, they must request paper statements and incur the paper statement fee.[54]

109. Rather than ensuring its customers can easily access their account statements, Pershing shifts the burden of access onto its customers. Customers without the necessary software are precluded from opting in to electronic delivery and therefore forced to pay paper statement fees.

110. These customers were unaware of SEC and FINRA guidelines that require, among other things, that "the use of a particular medium should not be so burdensome that intended recipients cannot effectively access the information provided."[55]

111. Pershing's customers reasonably and in good faith expected it to meet its contractual representation that it would abide by SEC and FINRA guidance. They did not contemplate that Pershing would profit – at their expense – from its circumvention of default

[54] *Id.*

[55] SEC Electronic Media Release 2, 65 Fed. Reg. at 25846.

paper delivery, and the requirement that Pershing must make statements maximally accessible to customers at no cost.

**5. The Pershing Plaintiffs paid paper statement fees for years, unaware of Pershing's deceptive conduct.**

112. The Pershing Plaintiffs, Alan Dalewitz (on behalf of the estate of Rose Weinstein), and Marsha DiGiacomo, through their respective brokers, have custodied brokerage accounts with Pershing. They have been harmed for their preference to receive regulatory disclosures in paper format, and for their refusal to opt in to electronic delivery.

113. The fees at issue are illustrated in the December 2025 account statement generated by Pershing for HJ Sims, Ms. Weinstein's broker. The account statement details three separate charges for "PAPER DELIVERY," each in the amount of $2.00, for a total of $6.00 in fees for delivery of paper statements that month. However, the statement does not clearly identify the documents for which paper delivery fees are being assessed.[56]

114. The statement includes the following notice: "You have not enrolled any documents for electronic delivery. The following documents are available for electronic delivery: Statements and Reports; Trade Confirmations; Notifications; Tax Documents; Prospectus; Proxy/Shareholder Communications."[57]

115. Mr. Dalewitz has paid the paper account statement fees from Ms. Weinstein's account, to the detriment of her beneficiaries, since he assumed the role of her executor.

116. Plaintiff Marsha DiGiacomo has similarly been paying fees for paper statements since Pershing first required her longtime broker, Northeastern, to charge them for paper statements.

117. Pershing misled Plaintiffs and others similarly situated into believing they remitted these fees to their brokers. Pershing also preyed on Plaintiffs' and similarly situated customers' lack of awareness that paper has long been the default method for delivery of account statements and trade confirmations. Moreover, the Pershing Plaintiffs, and similarly situated

---

[56] *See* Pershing December 2025 Account Statement.

[57] *See id*. at p. 3.

Pershing customers, continue to pay fees to receive the paper account statements that New York law requires them to receive for free.

118. Pershing's conduct violates New York's Unfair and Deceptive Practices Act. Pershing's cash grab from unsuspecting brokerage customers has netted the company an unlawful windfall.

**G. Morgan Stanley Allegations:**

**1. Morgan Stanley Wealth Management knowingly violated regulatory guidelines and New York consumer protection laws by charging customers fees for paper statements.**

119. Morgan Stanley Wealth Management ("MSWM") is a New York-based broker-dealer registered with FINRA and the SEC. Like the other Defendants, MSWM must follow applicable Federal regulatory guidelines in its dealings with customers.

120. Despite previously providing paper account statements for free, MSWM began charging its brokerage customers fees for delivery of paper statements in or before 2020.[58]

121. Ms. Torkelson did not want to receive electronic statements. But, when faced with the choice of either paying $25 for paper statements for each account or accepting electronic delivery, Ms. Torkelson felt pressured to avoid the paper statement fee. Against her preference, she opted in to electronic delivery. However, she incurred the expense of printing out her account statements herself.

122. MSWM's 2026 "Schedule of Miscellaneous Account and Service Fees" also illustrates, among other things, that MSWM charges a $6.50 "processing fee" per trade confirmation delivered in paper format, and a $5 fee for "duplicate statements" and "duplicate [trade] confirmations."[59]

---

[58] On information and belief, MSWM's practice of charging fees for paper statements might date back to 2016 or before. Morgan Stanley's June 2016 disclosure entitled Important New Account Information states that: "You may request a paper copy of any document delivered through eDelivery but you may incur a charge for that copy." *See* Morgan Stanley, Important New Account Information at 29 (June 2016), available at https://www.morganstanley.com/content/dam/msdotcom/en/wealth-relationshipwithms/pdfs/important_new_account_information_0616.pdf. Plaintiffs reserve the right to amend the allegations in this Complaint as new information becomes available.

[59] *See* Morgan Stanley Wealth Management Schedule of Miscellaneous Account and Service Fees at 3, 5, https://www.morganstanley.com/wealth-relationshipwithms/pdfs/account_and_service_fees.pdf.

123. Ms. Torkelson and other, similarly situated MSWM customers reasonably relied in good faith on MSWM's adherence to Federal guidelines regarding delivery of regulatory disclosures. They did not contemplate that MSWM would profit – at their expense – from its knowing circumvention of these Federal guidelines.

124. MSWM's imposition of fees for paper statements and trade confirmations constitutes a deceptive business practice and knowing violation of New York law General Business Law Section 399-zzz. Customers subject to MSWM's fees were likely unaware of their right to receive paper statements, or that paper is the default format for delivery of account statements. The only way for MSWM customers to avoid or reduce their paper statement fees was to consent to electronic delivery.

125. Additionally, MSWM knowingly engaged in deceptive conduct against individuals aged sixty-five and older and should therefore be subject to the additional civil penalty for frauds against elderly persons under New York law. Upon information and belief, a large portion of Plaintiffs represented by this class are sixty-five years or older. Morgan Stanley knows its customers' ages because customers must enter their birth dates, along with other personally identifying information, to open a brokerage account.

**2. E-Trade from Morgan Stanley knowingly and deceptively mislabeled paper statement fees as "handling fees."**

126. In or around October 2020, Morgan Stanley acquired E*Trade Financial Corporation to provide self-directed brokerage services to retail customers. Through the acquisition, Morgan Stanley added 5.2 million customer accounts with $360 billion in assets to its coffers.[60]

127. The newly formed E*Trade from Morgan Stanley ("E*Trade") is registered with FINRA as a d/b/a of Morgan Stanley. As such, it is governed by the federal rules and regulations of FINRA and the SEC.

[60] Son, Hugh, "Here's Why Morgan Stanley is Spending $13 Billion to Buy E-Trade," CNBC (Feb. 20, 2020), available at https://www.cnbc.com/2020/02/20/heres-why-morgan-stanley-is-spending-13-billion-to-buy-e-trade.html.

128. E*Trade's May 2026 Client Agreement for Self-Directed Accounts states that E*Trade may impose a charge for "any requested hard copy" of documents, including customer account statements and trade confirmations.[61]

129. E*Trade's online schedule for pricing and rates states: "You will be charged a $2.00 *handling fee* for each E*Trade paper statement mailed to your address of record, unless an exemption applies." (emphasis added). The exemptions include enrolling in electronic delivery, maintaining a minimum balance of $10,000 in cash and securities in linked E*Trade accounts, or a combined $20,000 or more in linked E*Trade and Morgan Stanley private bank accounts.[62] Like Vanguard, E*Trade imposes these "handling fees" on clients with lower balances.

130. E*Trade provides no detail or information regarding what the "handling fee" is intended to cover. The cost, $2.00 per statement, is not tied to postage or mailing costs. It is, in effect, a fee for paper statements that customers can only avoid by opting in to electronic delivery or maintaining a certain minimum balance in their E*Trade accounts.

131. E*Trade's reference to "handling fees" causes confusion among customers, who are also likely unaware of their right to receive paper account statements, or the fact that paper has been the default means to deliver regulatory disclosures for decades.

132. The so-called "handling fees" serve no purpose other than to generate proceeds for E*Trade, and to penalize customers who choose to receive their account statements in paper format.

[61] E*Trade from Morgan Stanley Client Agreement for Self-Directed Accounts at (May 2026), available at https://us.etrade.com/l/f/agreement-library/client-agreement.

[62] E*Trade from Morgan Stanley, Pricing and Rates, available at https://us.etrade.com/what-we-offer/pricing-and-rates (last visited August 2, 2026).

### 3. E*Trade violated regulatory guidelines and New York consumer protection laws by charging customers fees for paper statements.

133. Plaintiff Samuel Tsou has a brokerage account with E*Trade. Despite his preference to receive paper copies of his account documents, he opted into electronic delivery to avoid E*Trade's $2 "handling fee" for each statement.

134. Other, similarly situated E*Trade customers have been pressured into electronic delivery, despite their preference to obtain physical copies of account documents. Still others have paid the $2 "handling fee" to obtain paper account statements, unaware they are entitled to receive paper statements upon request as a matter of right.

135. Mr. Tsou and other, similarly situated E*Trade customers reasonably relied in good faith that, as a broker registered with FINRA and the SEC, E*Trade would adhere to Federal guidelines regarding delivery of account statements. They did not contemplate that E*Trade would profit – at their expense – from its circumvention of these guidelines.

136. E*Trade's imposition of paper statement fees constitutes an unfair and deceptive business practice and knowing violation of New York law, General Business Law Section 399-zzz. Customers subject to E*Trade's "handling fees" were likely unaware of their right to receive paper statements, or that federal regulators prescribed paper as the default format for delivery of account statements. The only way for E*Trade customers to avoid paper statement fees was to consent to electronic delivery or increase the assets in their accounts.

137. In assessing these "handling fees," E*Trade offers no incentive or credit to customers who opted in to electronic delivery. E*Trade simply penalizes customers who request paper statements.

138. Additionally, E*Trade knowingly engaged in deceptive conduct against individuals aged sixty-five and older and should therefore be subject to the additional civil penalty for frauds against elderly persons under New York law. Upon information and belief, a large portion of Plaintiffs represented by this class are sixty-five years old or older. E*Trade knows its customers' ages because customers must enter their birth dates, along with other personally identifying information, to open a brokerage account.

## VI. CLASS ALLEGATIONS

139. Plaintiffs bring this proposed class action for damages and injunctive relief pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

140. Plaintiffs bring this action on their own behalf and on behalf of the following classes:

141. Damages Class:

(a) All persons who, from the earliest date permitted by law through the date of final judgment, maintained at least one brokerage or other investment account with at least one Defendant and were assessed a fee in connection with the delivery of paper account statements or trade confirmations.

(b) All persons who, from the earliest date permitted by law through the date of final judgment, maintained at least one brokerage or other investment account with at least one Defendant and expended money printing out their own statements after Defendant imposed fees in connection with the delivery of paper account statements or trade confirmations.

142. Damages Sub-Class

All persons included in the above class who were at least sixty-five years old when at least one of the Defendants assessed a fee in connection with the delivery of paper account statements.

143. Injunctive Relief Class:

All persons who, from the earliest date permitted by law through the date of final judgment, maintained one or more brokerage or other investment accounts with at least one Defendant and (a) changed their statement or trade confirmation delivery preference from paper to electronic after the Defendant notified them that a fee would be charged for paper delivery, or (b) continue to pay fees for paper delivery of account statements or trade confirmations.

144. The proposed Classes are ascertainable. Members of each Class can be readily identified from Defendants' own business records, including account holder databases, billing records reflecting paper statement fees charged, delivery preference elections, and payment histories. Identification of Class members does not require individualized inquiry and is administratively feasible.

145. For purposes of the Class Definition, a "brokerage account" means an investment account typically used to buy and sell securities.

146. Excluded from the class are defendants; defendants' affiliates and subsidiaries; defendants' current or former employees, officers, directors, agents, and representatives; the district judge or magistrate judge to whom this case is assigned; as well as those judges' immediate family members; and all governmental entities.

147. **Numerosity:** The exact number of the members of the proposed class is unknown and is not available to the Plaintiffs at this time, but upon information and belief, the size of the class can be easily calculated from the records of Defendant. At a minimum, any reasonable estimate would exceed several thousand class members, rendering individual joinder in this case impracticable. Vanguard's website claims it has over fifty million investors as clients.[63] Even if only a small percentage of those are brokerage clients, and only a fraction of those either received paper statements or changed to electronic statements after being advised of a charge, joinder would be impractical.

148. **Commonality**: the questions of law and fact are common to the claims of the Plaintiffs and members of the proposed class. These include, but are not limited to:

(a) whether New York law governs the claims of the Class;

(b) whether Defendant charged customers a fee to receive their statements in paper form;

(c) whether such fees violate New York General Business Law § 349 and 399-zzz; and

(d) whether such fees violate the implied covenant of good faith and fair dealing;

(e) whether customers who changed their delivery preference to electronic are entitled to declaratory and/or equitable relief because of the threat of an illegal fee for paper statements;

(f) whether Defendants adequately disclosed to customers their right to receive paper statements under federal regulatory guidelines;

(g) whether Defendants' conduct was directed at or in willful disregard of the rights of elderly persons within the meaning of NY GBL § 349-C; and

[63] *See* https://corporate.vanguard.com/content/corporatesite/us/en/corp/who-we-are/sets-us-apart/facts-and-figures.html.

(h) the appropriate measure of damages for the Class.

149. **Typicality:** Plaintiffs' claims are typical of the claims of the members of the proposed class. Each Plaintiff was a brokerage customer of one or more Defendants who was either charged a fee for receiving paper account statements or trade confirmations or was coerced into accepting electronic delivery to avoid such fees. Plaintiffs' claims arise from the same course of conduct by Defendants—namely, the imposition of unlawful fees for paper delivery of regulatory disclosures in violation of New York law and contrary to federal regulatory guidance—and are based on the same legal theories applicable to the entire class.

150. **Adequacy:** Plaintiffs are committed to pursuing this action and have retained competent, experienced counsel for this precise subject matter and in class action litigation. Plaintiffs have no interests that are antagonistic to or in conflict with those of the Class. Both Plaintiffs and their counsel will fairly and adequately represent the interests of the Class.

151. **Injunctive and declaratory relief:** By way of their conduct described in this complaint, Defendants have acted on grounds that apply generally to the proposed class. Accordingly, final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

152. **Predominance:** Common questions of law and fact predominate over any questions affecting only individual members of the proposed Class. Defendants' liability can be established through common proof, including Defendants' uniform fee schedules, standardized account agreements, corporate policies regarding paper statement delivery and fees and adherence and enforcement of those policies, and the applicability of New York General Business Law §§ 349 and 399-zzz. Individual issues, if any, regarding the amount of fees paid are susceptible to mechanical individual calculation or aggregate proof using well-established statistical tools based on Defendants' billing records, both of which would prove class-wide damage and are recognized methods that do not affect or defeat predominance.

153. **Superiority**: Class proceedings on these facts and this law are superior to all other available methods for the fair and efficient adjudication of this controversy, given that

joinder of all members is impractical. Even if members of the proposed class could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and the expense to the parties. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Moreover, for many Class members, the amount of fees paid may be relatively modest, making individual lawsuits economically impracticable and the class mechanism the only realistic means of redress. Finally, given the nature of this action, many—and likely virtually all—are unaware of their rights and/or that they have a claim and are protected by New York law, and so would never know to bring suit or demand enforcement of their rights and remedies. This, together with the small nature of each Class member's individual damages, makes the Class action device the superior approach, if not the sole approach, to vindicate the rights of each Class member.

## VII. CLAIMS FOR RELIEF

### COUNT I: Violation of the New York GBL § 349 (Against All Defendants)

154. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

155. Defendants Vanguard, Pershing, and Morgan Stanley are brokerage firms, each thereby constituting a "person, partnership, corporation, association, or other business entity" under New York General Business Law § 399-zzz.

156. Brokerage Account Statements are "billing statements" under New York General Business Law § 399-zzz because they set forth the fees and charges that Defendants assess on consumers. Account statements qualify as billing statements under Section 399-zzz.[64]

---

[64] Unlike regulators in the banking industry, the SEC and FINRA, Defendants' federal regulators, have addressed brokers' manner of "speech" with their customers. Under these guidelines, customers have a right to receive paper statements on request, and paper format is currently the default means of delivery. *See discussion infra, at V.B. See also* SEC Electronic Media Release, 61 Fed. Reg. 24644; SEC Electronic Media Release 2, 65 Fed. Reg. 25843; FINRA Rule 2231, Supplementary Material .03: Use of Electronic Media to Satisfy Delivery Obligations. *See also* FINRA Regulatory Notice 23-02: Amendments to FINRA Rule 2231, Supplementary Material .03 (Jan. 18, 2023).

157. Vanguard charges Plaintiffs an "account service fee" to receive paper statements. Plaintiffs can only avoid this fee if they switch to electronic delivery.

158. Therefore, Vanguard violates NY GBL § 399-zzz, and in doing so commits a deceptive act and practice violative of New York General Business Law § 349, which makes deceptive acts and practice unlawful.

159. The "account service fee" is also deceptive in and of itself because it is not a general administrative fee, as the name suggests: it is simply a charge to receive paper statements.

160. At least between the period of 2020 and 2024, MSWM charged Plaintiffs a fee for paper statements which they could only avoid if they switched to electronic delivery.

161. Therefore, MSWM violated NY GBL § 399-zzz, and in doing so committed a deceptive act and practice violative of New York General Business Law § 349, which makes deceptive acts and practice unlawful.

162. Since at least 2020, E*Trade has charged customers with assets below a certain threshold fees for requesting paper statements. E*Trade violated NY GBL § 399-zzz, and in doing so committed a deceptive act and practice violative of New York General Business Law § 349, which makes deceptive acts and practice unlawful.

163. E*Trade also deceptively mislabeled the fees as "handling fees," without explanation or clarification as to what the fees were intended to cover. Because customers could only avoid these fees by opting in to electronic delivery or increasing the assets in their accounts, the fees were, in reality, a penalty on lower-value customers who requested paper account statements.

164. Since at least 2016, Pershing has required brokers using its custodial services to charge customers fees for paper delivery of account statements and other important documents. Customers may avoid this fee only if they opt in to electronic delivery. Moreover, Pershing prohibits brokers from paying paper delivery fees on behalf of customers; rather, brokers are a

pass-through for Pershing to impose and collect these fees. Pershing customers are misled to believe they are remitting payment for paper statements to their brokers, not to Pershing.

165. Therefore, Pershing violates NY GBL § 399-zzz, and in doing so commits a deceptive act and practice violative of New York General Business Law § 349, which makes deceptive acts and practice unlawful.

166. In addition, all Defendants knowingly engaged in deceptive conduct against individuals aged sixty-five and older and should therefore be subject to the additional civil penalty for frauds against elderly persons under New York law. Upon information and belief, a large portion of Plaintiffs represented by this class are sixty-five years or older. The Defendants were aware of customers' ages because customers are required to enter their birth dates, along with other personally identifying information, to open a brokerage account.

**COUNT II: Breach of the Implied Covenant of Good Faith and Fair Dealing (Against All Defendants)**

167. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

168. Defendants and Plaintiffs entered into a contract when Plaintiffs agreed to the Investor Agreement associated with their account.

169. By virtue of this contract, Defendants owe Plaintiffs a duty of good faith and fair dealing. This includes "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y. 2d 62, 69 (N.Y. 1978).

170. Vanguard, Morgan Stanley, and Pershing abused their contractually unequal bargaining power and acted in bad faith by charging Plaintiffs fees that were illegal under New York law.

171. Although federal regulatory guidance sets the standards by which broker-dealers deliver required disclosures, and Vanguard expressly committed to abide by those standards in

its account agreement, both Vanguard and Morgan Stanley charged paper statement fees that violated those standards, a departure Plaintiffs neither anticipated nor had reason to anticipate.

172. Pershing, as custodian, misrepresented that customers' brokers assessed fees for paper statements, concealing the fact that *Pershing required* brokers to charge their customers paper statement fees, and prohibited brokers from paying the fees on their customers' behalf.

173. Vanguard's, Pershing's, and Morgan Stanley's self-interested motives were to profit from aggregated paper statement fees, even if that profit came at the expense of the firms' individual customers. In imposing these fees on its customers, Vanguard, Pershing, and Morgan Stanley violated their duty to act in a customer's best interest and undermined a fundamental tenet of the broker/customer relationship.

174. Plaintiffs have suffered damages as a direct result of Vanguard's, Pershing's, and the Morgan Stanley Defendants' conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court:

A. Certify this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and/or 23(c)(4), appoint Plaintiff as Class Representative, and appoint Hagens Berman Sobol Shapiro LLP as Class Counsel;

B. Enter judgment in favor of Plaintiffs and the Class and against Defendants on all claims asserted herein;

C. Award compensatory damages to Plaintiffs and the Class in an amount to be determined at trial or through proof;

D. Award statutory and/or treble damages, as permitted by applicable law, based on Defendants' willful and knowing conduct;

E. Award additional civil penalties under NY GBL 349-C for class members aged sixty-five or over at the time of the deceptive fee assessment;

F. Award punitive damages, to the extent permitted by law, to deter and punish Defendants' unlawful conduct;

G. Grant declaratory relief, including a declaration that Defendants' practices concerning paper statement fees violate New York General Business Law § 399-zzz;

H. Grant injunctive and equitable relief, including orders: prohibiting Defendants from imposing or threatening to impose unlawful paper statement fees; requiring Defendants to restore, without charge, paper statement delivery for Class or Subclass members who were induced to accept electronic delivery to avoid such fees; and requiring Defendants to provide clear and lawful disclosures regarding customers' rights to receive paper statements;

I. Order restitution and/or disgorgement of all monies wrongfully obtained by Defendants as a result of their unlawful conduct;

J. Award pre-judgment and post-judgment interest at the maximum rate permitted by law;

K. Award Plaintiffs and the Class their reasonable attorneys' fees, costs, and expenses, as permitted by law; and

L. Grant such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED: September 21, 2026

Respectfully submitted,

Nathaniel A. Tarnor
HAGENS BERMAN SOBOL SHAPIRO LLP
594 Dean Street, Suite 8
Brooklyn, NY11238
Telephone: (212) 752-5455
Email: NathanT@hbsslaw.com

Robert B. Carey (*pro hac vice forthcoming*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson Street, Suite 1000
Phoenix, AZ 85003
Telephone: (602) 840-5900
Email: rob@hbsslaw.com

Elizabeth ("Ani") Zotti
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3051
Email: ani.zotti@hbsslaw.com

HAGENS BERMAN SOBOL SHAPIRO LLP

By: */s/ Raffi Melanson*
Raffi Melanson
1 Faneuil Hall Square, 5th Floor
Boston, MA 02109
Telephone: (617) 482-3700)
Email: raffim@hbsslaw.com

*Attorneys for Plaintiffs and the Proposed Class*